## No. 12,796.

## LA PLATA RIVER AND CHERRY CREEK DITCH COMPANY *v.* HINDERLIDER ET AL.

(25 P. [2d] 187)

Decided July 3, 1933.   Rehearing denied September 18, 1933.

Mr. REESE MCCLOSKEY, for plaintiff in error.

Mr. CLARENCE L. IRELAND, Attorney General, Mr. PAUL P. PROSSER, Attorney General, Mr. CHARLES ROACH, Assistant, Mr. RALPH L. CARR, for defendants in error.

*En Banc.*

Mr. Justice Burke delivered the opinion of the court.

Plaintiff in error is hereinafter referred to as the company and defendants in error as the water officials.

The company sought a mandatory injunction to protect its decreed rights to water for irrigation. The water officials set up two defenses, the second of which was a compact between the states of Colorado and New Mexico. The cause was tried to the court, which found generally for the water officials and entered judgment of dismissal, each party to pay its own costs. To review that judgment the company prosecutes this writ.

The La Plata river rises in the La Plata mountains in Colorado, flows in a general southerly direction, crosses this state's southern boundary near the southwest corner of La Plata county, and joins the San Juan river near Farmington, New Mexico. The company, through its diversion canal, the La Plata River and Cherry Creek ditch, has decreed priority No. 6 under which it is entitled to divert 39.25 cubic feet of water per second through its headgate on the La Plata river for the irrigation of lands in what is known as Thompson's Park in La Plata county. This water is in the stream, has been used and is needed by the company. Each state has adopted the same appropriation system of dealing with irrigation water. Other decrees similar to the company's and junior and senior to it, have been entered in each state. These interstate conflicting claims, and the controversies arising therefrom, induced the execution of the "La Plata River Compact" set up in the answer. Its negotiation was authorized by the general assemblies of the states, and pursuant to that authority it was negotiated and reported by commissioners. Colorado ratified it by chapter 191, S. L. 1923, wherein it is set out verbatim; New Mexico ratified it by chapter 7, S. L. 1923; and the Congress of the United States ratified it January

25, 1925, by chapter 110, Public Laws U. S., Second Session 68th Congress. Under that compact the waters of the La Plata river are "rotated" to meet, as nearly as possible, the rights and needs of appropriators in both states. This system results in interfering with the company's use of its decreed appropriation when it needs it, and under its decree is entitled to it.

In paragraphs of their brief, forceful in language, polished in diction, and tempting in the allurements they present, counsel for the water officials suggest the fascination and importance of the question of the validity of such compacts between sovereign states, and the propriety of its presentation to, and determination by, this tribunal. We think, however, the only material question presented by this record is the availability of said compact as a protection to the water officials in their violation of an existing and valid decree of the courts of this state. Neither the United States, nor the state of New Mexico nor its citizens, nor the state of Colorado, are parties to this controversy and, since no judgment herein entered can bind them, we disregard their possible claim. This litigation is between a citizen of this state and water officials who plead the compact as a justification for their failure to discharge duties and protect rights guaranteed by the Constitution, statutes and court decrees of Colorado.

If, by means of such a compact, state officials can take away from one man one day's use of water to which he is otherwise entitled, they can take away ten days' use. If they can rotate for a week, they can rotate for a month or a year. The compact in fact so recognizes, because it expressly provides that "The waters may be so rotated between the two states in such manner for such periods, and to continue for such time as the state engineers may jointly determine." If they can thus take water from an interstate stream at the state's border they can take it in the interior, and if they can thus take water they can take

any other property in any amount under similar facts and a similar pretext.

"No state shall, without the consent of congress, * * * enter into any agreement or compact with another state * * *." Art. I, sec. X, par. 2, U. S. Constitution. Conceding for the purposes of this case that this negative implies an affirmative, it falls far short of a grant of power to any state, with the consent of Congress, to enter into a compact violating federal or state constitutions.

"The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided." Art. XVI, sec. 5, Colorado Constitution.

"The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; * * *." Id. sec. 6.

Pursuant to statutes passed under the two last quoted sections, the company holds its decree and demands its water. These together certainly rise to the dignity of a contract and "No state shall * * * pass any * * * law impairing the obligation of contracts, * * *." Art. I, sec. X, par. 2, U. S. Constitution.

"Private property shall not be taken or damaged, for public or private use, without just compensation. Such compensation shall be ascertained by a board of commissioners, of not less than three freeholders, or by a jury, when required by the owner of the property, in such manner as may be prescribed by law, * * * and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public." Art. II, sec. 15, Colorado Constitution.

The question here is not one of condemnation. There has been here no judicial taking of private property for public use with just compensation. The compact makes no provision for compensation and none has here been paid or tendered.

In its desire to foster irrigation and promote the construction of irrigation works this court, by a majority decision, two of the justices dissenting, once limited the protection of the foregoing section to proceedings in eminent domain. *North Sterling Irr. Dist. v. Dickman,* 59 Colo. 169, 149 Pac. 97. The question was, however, later reexamined by us and in a decision en banc in which all the justices concurred (including the two who formerly dissented and two of those who formerly concurred), the Dickman case was expressly overruled and the constitutional prohibition given its literal interpretation and full force. *Commissioners v. Adler,* 69 Colo. 290, 194 Pac. 621.

   ■   ''No person shall be deprived of * * * property, without due process of law.'' Art II, sec. 25, Colorado Constitution. A decreed priority to the use of water for irrigation is not only a property right, it is a freehold. *Strickler v. City of Colo. Spr'gs,* 16 Colo. 61, 26 Pac. 313; *Monte Vista Co. v. Centennial Irr. D. Co.,* 22 Colo. App. 364, 123 Pac. 831.

   ■   Due process always implies a hearing or trial, and judgment. It secures the individual ''from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice.'' *People v. Max,* 70 Colo. 100, 108, 198 Pac. 150. If private rights may be stripped from the citizen by state ''compacts,'' by legislative fiat, by commissioners, by the uncontrolled discretion of state engineers, then ''due process'' is dead in Colorado.

The briefs herein give much space to, and the respective parties seek to shelter their claims under, the opinions in *Kansas v. Colorado,* 206 U. S. 46, 27 Sup. Ct. 655; and *Wyoming v. Colorado,* 259 U. S. 419, 42 Sup. Ct. 594;

260 U. S. 1, 43 Sup. Ct. 2. The latter concerned the conflicting claims of states which had adopted the appropriation system, and the former the conflicting claims of states one of which had adopted that system while the other adhered to the doctrine of riparian rights. They do not touch the right of a state by compact, without notice, hearing or compensation, to take property from one of its citizens and give it to another state or its citizens as a mere matter of expediency, without regard to the legality of their claims thereto, and in total disregard of existing constitutional, statutory and judicial prohibitions.

The water officials call to their aid certain other decisions of the United States Supreme Court upholding compacts fixing state boundaries; principally *Poole v. Lessee of Fleeger,* 11 Pet. 185; and *Coffee v. Groover,* 123 U. S. 1, 8 Sup. Ct. 1. But in neither of these, nor in any case known to us, has a state even attempted, by compact, to transfer to another any part of its admitted territory when by that transfer it ousted its lawful grantees in favor of those whose titles were originally derived from a state which had nothing to convey. As between a state and those who claim under it, the state is the sole judge of its own boundaries. It may have granted land on the theory that it owned it and thereafter discovered that it did not. Its grantee may thereupon be dispossessed, not because the state takes away what it granted, but because it decides that it never owned, hence could never grant.

There is not the slightest pretense, either in this compact itself or in the proceedings leading up to it, to a decision of the question of what water Colorado owns, or what water New Mexico owns, or what their respective citizens own. It is a mere compromise of presumably conflicting claims, a trading therein, in which the property of citizens is bartered, without notice or hearing, and with no regard to vested rights.

The judgment is reversed and the cause remanded for further proceedings in harmony herewith.

MR. CHIEF JUSTICE ADAMS, MR. JUSTICE HILLIARD and MR. JUSTICE BOUCK concur.

MR. JUSTICE BUTLER dissents.

MR. JUSTICE CAMPBELL not participating.

MR. JUSTICE BUTLER, dissenting.

It is respectfully submitted that the court has not taken a sufficiently broad view of the issues presented by the record. The defendants in error defend their acts by alleging that they were done pursuant to the compact made by Colorado and New Mexico. The plaintiff replies, in substance, that the acts of the defendants were done in disregard of the Colorado court decrees and laws, and therefore deprived the plaintiff of its vested rights. If this does not present squarely the question of the validity and effect of the compact, I am unable to imagine a case that would do so. It is obvious that the legality of the defendants' acts depends upon the validity and terms of the compact; therefore we cannot very well avoid a consideration thereof.

Where a person invokes a statute, or a treaty, or a compact, or an agreement, as a justification for his acts, and its validity is challenged by his adversary, the question of its validity is presented to the court for determination. Citation of the many authorities that sustain this position is unnecessary. Three will suffice. See *Poole v. Lessee of Fleeger*, 11 Pet. 185; *Wharton v. Wise*, 153 U. S. 155, 14 Sup. Ct. 783; *Georgetown v. Alexandria Canal Co.*, 12 Pet. 91, 9 L. Ed. 1012.

It is not necessary to a determination of the question presented by this record that the United States, or the state of Colorado, or the state of New Mexico should be parties to this suit. The fact that the decision in this case would not be res adjudicata as to them does not re-

lieve the court of the duty of passing upon the question submitted.

What are the respective rights of Colorado and New Mexico in the waters of the La Plata river?

It has been decided that the upper state on an interstate stream does not have such ownership or control of the waters flowing therein as entitles it to divert and use them regardless of any injury or prejudice to the rights of the lower state in the stream. *Kansas v. Colorado*, 185 U. S. 125, 22 Sup. Ct. 552; *Wyoming v. Colorado*, 259 U. S. 419, 42 Sup. Ct. 552. Section 5, article XVI, of the Colorado Constitution, declaring that the water of every natural stream within the state is the property of the public and is dedicated to the use of the people of the state, does not alter the situation; that section applies only as between this state and the people of this state. Each state on an interstate stream is entitled to an equitable share of its waters. In controversies between such states the effort is to secure an equitable division or apportionment. *Kansas v. Colorado, supra.* In *Wyoming v. Colorado, supra,* it is said that as both states have adopted the doctrine of appropriation, such doctrine "furnishes the only basis which is consonant with the principles of right and equity applicable to such a controversy," and that, "its application to such a controversy as is here presented cannot be other than eminently just and equitable to all concerned." However, in two later cases (decided in 1931), where the states concerned had adopted the common-law doctrine of riparian rights, the court refused to apply the riparian-right doctrine in determining the controversy, and applied instead the principle of equitable apportionment. *Connecticut v. Massachusetts,* 282 U. S. 660, 51 Sup. Ct. 286; *New Jersey v. New York,* 283 U. S. 336, 51 Sup. Ct. 478. In the latter case the court said: "Both States have real and substantial interests in the River that must be reconciled as best they may. The different traditions and practices in different parts of the country may lead to vary-

ing results, but the effort always is to secure an equitable apportionment without quibbling over formulas. * * * This case was referred to a Master and a great mass of evidence was taken. In a most competent and excellent report the Master adopted the principle of equitable division which clearly results from the decisions of the last quarter of a century.''

These cases justify the conclusion that each state is entitled to an equitable share of the waters of an interstate stream, and that where both states have adopted the doctrine of appropriation the relative priorities of the appropriations should be considered as of controlling importance in ascertaining what that equitable share is.

When a controversy arises between two states concerning their rights in the waters of such a stream, must those states, in order to have the controversy determined, resort to litigation with its attendant expense and delay, or may they settle the controversy by compact? It seems clear that with the consent of Congress they may pursue the latter course. Their right to do so does not depend upon a grant of power. Powers are reserved by, not granted to, the states. The tenth amendment provides: ''The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states, respectively, or to the people.'' Article I, sec. X, par. 2, of the U. S. Constitution provides: ''No state shall, without the consent of congress, * * * enter into any agreement or compact with another state.'' As to powers not delegated to the United States, the states are sovereign. *Chisholm v. Georgia,* 2 Dall. (U. S.) 419; *M'Culloch v. Maryland,* 4 Wheat. 316. Sovereign states may settle their controversies by treaty or by war. The Constitution deprived the states of the right to resort to the latter remedy, and substituted therefor a suit in the Supreme Court. So the two remedies remaining are compact and litigation. Either may be invoked, the former with the consent of Congress.

It has been held that there are cases where such consent is not necessary, but we are not concerned with them, for here Congress gave its consent. Counsel call our attention to a list of fifty-five instances where compacts between states have been approved by Congress. Interstate compacts have been made concerning boundaries, the taking of fish in boundary rivers, navigation, irrigation rights, and other matters.

The Supreme Court of the United States has suggested repeatedly the desirability of settling interstate controversies by compact. In *Rhode Island v. Massachusetts,* 12 Pet. 657, the court said: "Bound hand and foot by the prohibitions of the constitution, a complaining state can neither treat, agree, nor fight with its adversary without the consent of congress; a resort to the judicial power is the only means left for legally adjusting or persuading a state which has possession of disputed territory, to enter into an agreement or compact relating to a controverted boundary. Few, if any, will be made, when it is left to the pleasure of the state in possession; but when it is known that some tribunal can decide on the right, it is most probable that controversies will be settled by compact." That language was quoted in *Kansas v. Colorado, supra,* wherein the court said also: "* * * compacts and agreements might be very properly applied 'to such as regarded what might be deemed mere private rights of sovereignty; such as questions of boundaries; interests in land situate in the territory of each other; and other internal regulations for the mutual comfort and convenience of States bordering on each other.' 2 Story, Const. §§1402, 1403; *Louisiana v. Texas,* 176 U. S. 1." In the Kansas-Colorado controversy Congress had not consented to a compact, and in view of that situation the court, by Mr. Justice Brewer, used this language: "If the two states were absolutely independent nations it would be settled by treaty or by force. Neither of these ways being practicable, it must be settled by decision of this court." *Kansas v. Colorado,* 206 U. S. 46, 98, 27

138

Sup. Ct. 655. In *Washington v. Oregon*, 214 U. S. 205, 29 Sup. Ct. 631, the court, after calling attention to compacts made by other states, made this suggestion: "We submit to the States of Washington and Oregon whether it will not be wise for them to pursue the same course, and, with the consent of Congress, through the aid of commissioners, adjust, as far as possible, the present appropriate boundaries between the two States and their respective jurisdiction." In *New York v. New Jersey*, 256 U. S. 296, 41 Sup. Ct. 492, the court said: "We cannot withhold the suggestion, inspired by the consideration of this case, that the grave problem of sewage disposal presented by the large and growing populations living on the shores of New York Bay is one more likely to be wisely solved by cooperative study and by conference and mutual concession on the part of representatives of the states so vitally interested in it than by proceedings in any court however constituted." Acting, no doubt, upon the suggestions made by that great court, the western states have resorted extensively to compacts as the most satisfactory way of settling controversies over their rights in the waters of interstate streams.

The Colorado-New Mexico compact was made by the two states, acting through their Legislatures, and was ratified by Congress. It is the law of the land, unless it is made to appear beyond a reasonable doubt that it is in conflict with the federal or the state Constitution.

In the majority opinion it is said: "There is not the slightest pretense, either in this compact itself or in the proceedings leading up to it, to a decision of the question of what water Colorado owns, or what water New Mexico owns, or what their respective citizens' own. It is a mere compromise of presumably conflicting claims, a trading therein, in which the property of citizens is bartered, without notice or hearing, and with no regard to vested rights." In 1921 the Legislature of this state passed an act for the appointment of a commissioner to represent Colorado upon a joint commission "for the purpose of

negotiating and entering into a compact or agreement between said states [i. e., Colorado and New Mexico], with consent of Congress, respecting the future utilization and disposition of the waters of the La Plata River, and all streams tributary thereto, and *fixing and determining* the rights of each of said states to the use, benefit and disposition of the waters of said stream." S. L. 1921, c. 244. The Legislature of New Mexico passed a similar act. S. L. 1921, c. 147. There is a presumption that the commission regularly pursued the authority vested in it, that it performed its duties properly, and that it acted only after due investigation and consideration of all the material facts, including, as required by the court in *Wyoming v. Colorado, supra,* the appropriations of water in both states, and the relative priorities of such appropriations. We should not assume, in the absence of a contrary showing—and there is no such showing here— that the commission acted otherwise; for example, that its members traded or bartered away the property or rights of citizens in disregard of the plain provisions of the statutes creating the commission. The plaintiff introduced no evidence of the proceedings of the commission, or of the facts and circumstances that controlled it in drafting the tentative compact for submission to the two Legislatures, and no evidence that it failed to consider all relevant facts. It does appear from the report of the Colorado commissioner that the proposed compact provided "for the equitable distribution of the waters of the La Plata river." That the commission considered the appropriations in both states, and their relative priorities, is evident from the report, which deals in general terms with the priority of use in New Mexico and Colorado, and the aggregate quantity of water diverted in New Mexico. Colorado Senate Journal for 1923, p. 67, et seq. The compact itself provides: "The waters of the La Plata River are hereby equitably apportioned between the signatory States, including the citizens thereof, as follows:" The record, therefore, reinforces

the presumption of regularity, though such presumption requires no such support, the burden, as we have seen, being upon the one asserting that the commission did not perform its duty properly to sustain such assertion by proof. Moreover, the compact was the act, not of the joint commission, but of the two sovereign states, acting through their Legislatures, after ample opportunity to investigate and consider all of the facts. And with the same opportunity, Congress ratified the compact. An act of the Legislature, of course, is presumed to be constitutional, and one assailing it as in conflict with the Constitution must show beyond any reasonable doubt that the two are in conflict.

Does the compact deprive the plaintiff of its property without due process of law? It would seem not.

The compact did not interfere with any vested right of the plaintiff. The right that is vested in the plaintiff is the right to use, in the order of its adjudicated priority, a part of the La Plata river waters belonging to the state of Colorado; it has no right whatever to any of the water belonging to the state of New Mexico, for Colorado cannot confer such right, or make a valid contract to do so. The compact determines the equitable share belonging to each state. Neither state can confer upon any person the right to use water belonging to the other state. The priority decreed to the plaintiff's ditch is not interfered with; it must be satisfied, however, only out of Colorado's equitable share of the La Plata river waters. All appropriations in each state were made subject to the rights of the other state in the waters of the stream, precisely the same as if that limitation were written in the water decrees.

The compact provides that when the mean daily flow of water at the Interstate Station is 100 cubic feet or more per second, each state shall have the unrestricted right to use all of the waters within its boundaries; and that, ''On all other days the State of Colorado shall deliver at the Interstate Station a quantity of water equiva-

lent to one-half of the mean flow at the Hesperus Station for the preceding day, but not to exceed one hundred cubic feet per second." It also provides: "Whenever the flow of the river is so low that in the judgment of the State Engineers of the States, the greatest beneficial use of its waters may be secured by distributing all of its waters successively to the lands in each State in alternating periods, in lieu of delivery of water as provided in the second paragraph of this Article, the use of the waters may be so rotated between the two States in such manner, for such periods, and to continue for such time as the State Engineers may jointly determine." The La Plata river is a small stream having unusual seepage conditions. Kinney, in section 909 of his work on Irrigation and Water Rights (2d Ed.), says: "As was said before, irrigation experts and hydraulic engineers agree upon the proposition that rotation in the use of water, especially in cases where the supply is small, not only gives a higher duty to an available water supply, but it tends directly to suppress the actual waste of the water." That statement is amply supported by the testimony of the state engineer of Colorado and that of the interstate engineer. There seems to be no good reason why, by compact, two sovereign states may not measure the equitable share of each by time as well as by quantity, in order to save waste and obtain the utmost beneficial use of the water for the development of both states. *Anderson v. Bassman*, 140 Fed. 14, was a controversy between parties who resided in different states and claimed water rights in an interstate stream. Delivering the opinion of the Circuit Court, Judge Morrow said: "The right of each is to have a reasonable apportionment of the water of the stream during the season of the year when it is scarce. But to divide the water so as to allow a certain number of inches to the complainants and a certain number of inches to the defendants is plainly impracticable. The only method that appears to provide a just and equitable division is some fair and appropriate division in

time by which the complainants and defendants shall have the use of the water alternately during the dry season. I shall therefore direct that a decree be entered restraining the defendants from diverting the waters of the West Fork of the Carson River in excess of five days in every ten days during the months of June, July, August, September, and October in each year.''

There can be no valid objection to the compact on the ground that it entrusts to the engineers of both states, acting jointly, the administrative duty of carrying out the rotation provision of the compact. The compact could not regulate such a matter by hard-and-fast rules. Conditions that vary from time to time make it necessary to entrust to irrigation experts some measure of discretion, and who better qualified for the task than the two state engineers? In *Wisconsin v. Illinois,* 278 U. S. 367, 49 Sup. Ct. 163, Wisconsin, Minnesota, Ohio and Pennsylvania sought an injunction to prevent the taking of water from Lake Michigan in such manner as permanently to divert the water from the lake. Congress had conferred upon the chief engineers and the secretary of war the authority to determine the amount of water that may be diverted from a lake without impairing navigability. The court upheld the act as not a delegation of legislative power, saying that such determination is peculiarly an expert question. And see: *People v. Colorado Title & Trust Co.,* 65 Colo. 472, 178 Pac. 6; 6 R. C. L. p. 174. The objection that if under the compact the officers can rotate for a week they can rotate for a month or a year, is unsound. The answer is that if they should attempt an abuse of their power, the courts could, and upon proper application would, restrain them.

I cannot find any evidence to sustain the intimation that the compact was made without notice to the plaintiff and those claiming under it and without giving them a hearing. If notice and a hearing were necessary to the validity of the compact—and they were not—the burden was upon the plaintiff to prove that there was no notice

or hearing. No such proof or offer of such proof was made. Answering the intimation, counsel for the defendants in error made this statement in their answering brief, and it was not challenged by opposing counsel: "The suggestion is made that the owners of decrees in Colorado were given no opportunity to be heard * * *. Counsel feel impelled to state that a number of public meetings were held which were attended by representatives of the Thompson Park section. The matter was thoroughly discussed and every effort made to learn the true facts before closing the Compact." Moreover, the water decrees are matters of record, and complete data concerning them were in possession of the state engineer, who, according to the report of the Colorado Commissioner, was in charge of investigations as the expert for Colorado. It is inconceivable that the commission acted without full information; the presumption is that it did not so act, and there is no showing to the contrary.

The compact was made, as all interstate compacts are made, by sovereign states, and when such compacts are made they are binding upon the states and all citizens of the states.

Virginia and Kentucky entered into a compact relating to the Ohio river. Concerning the effect of that compact, it was said by the court: "This Compact by the sanction of Congress has become a law of the Union. * * * In the case of Green v. Biddle, 8 Wheat. 1, this court held that a law of the state of Kentucky which was in violation of this compact between Virginia and Kentucky, was void; and they say this court has authority to declare a state law unconstitutional upon the ground of its impairing the obligation of a compact between different states of the Union." *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 13 How. 518. In *Lessee of Marlatt v. Silk,* 11 Pet. 1, a suit between private parties, a compact between Pennsylvania and Virginia came into question. The following is quoted from the opinion: "* * * in the case at bar, the question arises under, and is to be decided by, a

compact between two states: where, therefore, the rule of decision is not to be collected from the decisions of either state, but is one, if we may so speak, of an international character." Speaking of the right of states to make compacts and of the effect of such compacts, the court said, in *Rhode Island v. Massachusetts, supra:* "If congress consented, then the states were in this respect restored to their original inherent sovereignty; such consent being the sole limitation imposed by the constitution, when given, left the states as they were before, as held by this court in Poole v. Fleeger, 11 Pet. 209; whereby their compacts become of binding force, and finally settled the boundary between them; operating with the same effect as a treaty between sovereign powers. That is, that the boundaries so established and fixed by compact between nations, become conclusive upon all the subjects and citizens thereof, and bind their rights, and are to be treated to all intents and purposes, as the true real boundaries."

Compacts settling water controversies have the same effect as decrees of court determining such controversies; both bind the citizens of the states, though not parties thereto. In *Kansas v. Colorado,* 206 U. S. 46, 27 Sup. Ct. 655, the court said: "While several of the defendant corporations have answered, it is unnecessary to specially consider their defenses, for, if the action against Colorado fails, it fails also against them." And in the second case of *Wyoming v. Colorado,* 286 U. S. 494, 52 Sup. Ct. 621, brought to restrain an alleged violation of the decree rendered in the first case (185 U. S. 125), the court held (syllabus 2): "In a suit between two States to determine the relative rights of each and of their respective citizens to divert water from an interstate stream, private appropriators are represented by their respective States and need not be made parties to be bound by the decree." In *Poole v. Lessee of Fleeger, supra,* Mr. Justice Story said: "The compact, then, has full validity, and all the terms and conditions of it must

be equally obligatory upon the citizens of both states."
In *Georgetown v. Alexandria Canal Co., supra,* the court
said: "The compact made in the year 1785, between Vir-
ginia and Maryland, was made by the two states in their
character as states. The citizens, individually, of both
commonwealths, were subject to all the obligations im-
posed, and entitled to all the benefits conferred by that
compact."

Being of the opinion that the plaintiff has not sus-
tained the burden resting upon it of showing that the
Colorado-New Mexico compact is unconstitutional, or
that its enforcement in the present case deprived the
plaintiff of some lawful right, I respectfully dissent from
the decision and the opinion of the court.